UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDWARD D. JONES & CO., L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03810-SEB-DML |
| | ) | |
| JOHN KERR, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiff Edward D. Jones & Co., L.P.'s

("Edward Jones") Motion for Temporary Restraining Order and Preliminary Injunction

[Dkt. 4] filed on September 6, 2019. With that motion, Edward Jones seeks, consistent

with Defendant John Kerr's employment agreement, an order enjoining him from

soliciting, attempting to solicit, inducing to leave, or attempting to induce to leave any

Edward Jones client serviced by Defendant while at Edward Jones or with respect to

whom Defendant was privy to trade secret or confidential information [Dkt. 4-1].

Plaintiff also seeks to enjoin Defendant from using, disclosing, or transmitting for any

purpose Plaintiff's documents, materials, trade secrets, and/or confidential or proprietary

information pertaining to Plaintiff's employees, its operations, and/or its clients [*Id.*] This

matter came before the Court for oral argument on October 28, 2019.

For the reasons detailed in this entry, Plaintiff's motion is DENIED.

## Factual Background

### I.     The Parties

Edward Jones is a limited partnership and a registered broker/dealer operating more than 14,000 branch offices across the United States, including in Westfield, Indiana [Compl. ¶ 8]. It offers a wide variety of investment and financial advisory services and specializes in operating one-person branch offices in small to medium-sized markets that have not traditionally been serviced by larger investment firms [Dkt. 5, at 2]. Mr. Kerr was employed as a Financial Advisor in Edward Jones's Westfield branch for over twenty years, beginning his employment in July 1998 until his departure on August 1, 2019 [Dkt. 5, at 2; Dkt. 22, at 2-3]. Mr. Kerr served as the sole financial advisor in the Westfield branch for his entire tenure [Dkt. 22, at 3]. Mr. Kerr asserts, and Edward Jones does not dispute, that a substantial portion of the Westfield branch's client base was generated from Mr. Kerr's personal network in the community [Dkt. 22, at 3-4; Dkt. 22-1, ¶¶ 4, 6, 7].

The parties agree that their dispute is subject to arbitration pursuant to the Financial Industry Regulatory Authority ("FINRA")[1] Code of Arbitration. Notwithstanding the FINRA arbitration proceedings, Edward Jones is entitled to seek preliminary injunctive relief. FINRA RULE 13804(a) (2019).

---

[1] FINRA is a non-governmental organization authorized by Congress to oversee the broker-dealer industry. FINRA writes and enforces rules governing the ethical activities of all registered broker-dealer firms and registered brokers in the United States.

## II.     The Agreement

As a condition of his employment with Edward Jones, Mr. Kerr agreed to an

"Investment Representative Employment Agreement" ("the Agreement"), which he

executed at the outset of his employment in 1998 [Compl., Exh. A]. The Agreement has

never been revised.

The Agreement requires that all of Edward Jones's property be returned upon an

employee's termination or resignation. It provides:

> You shall keep and preserve all furniture, equipment, signs, account records,
> customer statements and files, manual, forms, supplies, and literature and shall
> deliver such property to Edward Jones, if requested, during the course of your
> employment. In the event your employment with Edward Jones ends either
> through termination by Edward Jones or through resignation by you, you will
> surrender to Edward Jones all of the above such property which shall be and
> remain the property of Edward Jones.

The Agreement states in a subsequent paragraph: "It is understood and agreed that the

identities of and information concerning the customers of Edward Jones are confidential

information, constitute a trade secret, and are the sole and exclusive property of Edward

Jones." The Agreement also prohibits Mr. Kerr from soliciting Edward Jones's clients:

> For a period of one year following termination of this Agreement, you will not
> directly or indirectly solicit sales of securities and/or insurance business to or from
> any customer of Edward Jones or otherwise induce any said customer of Edward
> Jones to terminate his/her relationship with Edward Jones, if you contacted or
> dealt with such customer during the course of, or by reason of, your employment
> with Edward Jones or if the identify of such person was learned by you by reasons
> of your employment with Edward Jones.

Pursuant to a choice of law clause in the Agreement, the parties agree that Missouri law governs Edward Jones's breach of contract claims.[2]

### III. Mr. Kerr's Departure from Edward Jones and Commencement of Employment with Thurston Springer Financial

The parties dispute the circumstances underlying Mr. Kerr's departure from Edward Jones as well as other events that took place in the days surrounding his resignation.

In Edward Jones's version of the facts, Mr. Kerr was facing disciplinary issues[3] at work, which prompted Edward Jones to request that Mr. Kerr report for a human resources meeting at its headquarters in St. Louis, Missouri on August 1, 2019 [Compl. ¶¶ 42, 43]. Edward Jones claims that Mr. Kerr had to have known he was going to be terminated at the human resources meeting and thus had begun planning his transition to Thurston Springer Financial ("Thurston") [*Id.* ¶ 44]. At the meeting, Edward Jones allowed Mr. Kerr to resign in lieu of a termination and used that opportunity to remind him of his obligation, pursuant to the Agreement, to return any of Edward Jones's property in his possession [ *Id.* ¶¶ 46, 47]. Edward Jones did not identify who was present at the human resources meeting or who directed Mr. Kerr to return Edward Jones's

---

[2] The clause states, "This Agreement shall be deemed to be a Missouri contract and governed by the laws there." Although Edward Jones initially applied Indiana law to its breach of contract claims, it conceded that Missouri law applies after Mr. Kerr raised the issue. Applying Indiana choice of law principles and without dispute from the parties, we have no difficulty determining that Missouri law governs the breach of contract claims. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law."); *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E. 2d 1157, 1162 (Ind. 2002); ("Indiana choice of law doctrine favors contractual stipulations as to governing law.").

[3] Edward Jones does not explain what these disciplinary issues were.

property, nor could counsel for Edward Jones confirm these identities at the court hearing on the request for an injunction. Edward Jones asserts that Mr. Kerr, knowing a termination was impending, illicitly printed confidential client reports for the benefit of his future employer, Thurston, before the St. Louis human resources meeting [*Id.* ¶ 44, 45, 50; Dkt. 5, at 5]. These reports allegedly listed the clients at the Westfield branch along with their assets managed by the branch as well as the commissions generated by each client [Compl. ¶ 45; Dkt. 5, at 5]. Edward Jones states that it has been unable to ascertain the whereabouts of these client reports [Compl. ¶ 49]. At the court hearing, counsel for Edward Jones confirmed that Edward Jones never contacted Mr. Kerr to inquire about the clients reports prior to initiating this lawsuit.

Mr. Kerr's factual account sharply contrasts with Edward Jones's and is buttressed by his sworn, detailed affidavit. Mr. Kerr states that from July 16, 2019 to July 27, 2019, he was traveling in Ireland on business for Edward Jones [Dkt. 22, at 5; Dkt. 22-1, ¶ 14]. During that time, unbeknownst to Mr. Kerr, Edward Jones reassigned many of Mr. Kerr's clients [Dkt. 22, at 5; Dkt. 22-1, ¶ 14]. When Mr. Kerr returned to work in Westfield on the afternoon of July 29, 2019, Mr. Kerr was informed that Edward Jones required him to travel to St. Louis on August 1, 2019, for a human resources meeting regarding an on-going dispute with his long-time branch office administrator, Kennetta White [Dkt. 22, at 5; Dkt. 22-1, ¶ 15]. Upon learning that he was being summoned to St. Louis, Mr. Kerr contacted a friend who had experience with Edward Jones to discuss the problems with Ms. White [Dkt. 22, at 5; Dkt. 22-1, ¶ 33]. During that conversation, the friend informed Mr. Kerr that there may be a potential job opportunity for him at Thurston. Mr. Kerr

states that this was his first awareness of or discussion regarding any potential employment with Thurston [*Id.*].

Prior to the Ireland trip or the scheduling of the human resources meeting in St. Louis, Mr. Kerr had previously scheduled a branch meeting for July 30, 2019 [Dkt. 22, at 5; Dkt. 22-1, ¶ 16]. On the morning of July 30, in preparation for that meeting, Mr. Kerr printed the client reports now in dispute [*Id.*]. Because his practice had undergone a material change during the time he was in Ireland due to the reassignment by Edward Jones of his clients, Mr. Kerr sought to review the reports to fully understand these changes in preparation for the branch meeting. He states that when he printed these reports, he did so openly and in the ordinary course of business with the sole purpose of using them at the branch meeting [Dkt. 22, at 5; Dkt. 22-1, ¶¶ 16-17]. He claims he had no intention of resigning or transferring to Thurston when he printed the reports on July 30, 2019 [Dkt. 22, at 5; Dkt. 22-1, ¶ 20].

On August 1, 2019, Mr. Kerr drove to St. Louis to attend the human resources meeting. Claiming that he was unsure of the purpose of that meeting, he opted to bring the three client reports with him so that he could fully discuss the status of the accounts at his branch [Dkt. 22, at 6; Dkt. 22-1, ¶ 19]. However, upon arrival, Mr. Kerr learned that Edward Jones had decided not to continue his employment [Dkt. 22, at 6; Dkt. 22-1, ¶ 20]. He disputes Edward Jones's assertions that he himself had any prior intention of resigning or any prior knowledge that he would be terminated at this meeting [*Id.*]. Notwithstanding his decision at the meeting to tender his resignation, Mr. Kerr argues that no one from Edward Jones ever demanded that he return Edward Jones materials, nor

did anyone provide any instructions regarding the distribution or disposal of materials [Dkt. 22, at 6; Dkt. 22-1, ¶ 21].

Mr. Kerr did not return to his Westfield branch office again following the human resources meeting in St. Louis (with the exception of when he returned to collect his personal property with Edward Jones's consent and witnesses present) [Dkt. 22, at 6; Dkt. 22-1, ¶ 34]. Mr. Kerr states that he destroyed the three clients reports in his possession immediately following the human resources meeting, believing this to be the proper course of action, and never used or referred to the information therein, or any other Edward Jones information, after his resignation or for any improper purpose [Dkt. 22, at 7; Dkt. 22-1, ¶¶ 34-35]. Mr. Kerr joined Thurston on August 2, 2019, claiming that he did so only after being forced to resign from Edward Jones [Dkt. 22, at 6; Dkt. 22-1, ¶ 23].

Edward Jones did not respond in its Reply brief to Mr. Kerr's averments that he did not know he was going to be terminated and that he had no plans to leave Edward Jones for Thurston prior to his resignation. At the court hearing, counsel for Edward Jones asserted that Mr. Kerr had worked for Edward Jones long enough to understand that a human resources meeting at headquarters was always a precursor to termination. Counsel for Edward Jones also stated that he believed discovery would uncover e-mails between Mr. Kerr and Thurston discussing employment opportunities prior to the human resources meeting. However, counsel ultimately conceded that Edward Jones did not currently have any evidence, aside from its speculations, to contradict Mr. Kerr's sworn statements that he had no intention of leaving Edward Jones at the time he printed the client reports.

Edward Jones's Reply brief also did not address Mr. Kerr's assertion that he had printed the client reports only for legitimate, business-related purposes. Edward Jones's counsel, after confirming that there was no evidence that Mr. Kerr had taken any steps to secure employment with Thurston prior to his resignation, agreed that Mr. Kerr was operating within the ordinary course of business when he printed the reports and was entitled to take them to his meetings. Counsel also conceded that Edward Jones had no evidence that Mr. Kerr had retained or used the client reports following his resignation. Aside from the client reports, Edward Jones has not accused Mr. Kerr of any wrongful retention or use of Edward Jones information.

## IV.    Mr. Kerr's Alleged Solicitation of Edward Jones Clients

We note that Edward Jones's request for injunctive relief initially encompassed six claims: breach of the Agreement's confidentiality provision; breach of the Agreement's non-solicitation provision; violation of the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code. § 24-2-3-1 (2019); violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C.A. § 1836 (2018); unfair competition; and tortious interference with business relationships. At the court hearing, counsel for Edward Jones conceded that it lacked sufficient evidence at this time to support preliminary injunctive relief based on the statutory trade secrets claims and the alleged breach of the confidentiality provision.[4]

---

[4] After confirming that Edward Jones had no evidence to contradict Mr. Kerr's declaration that he had destroyed the client reports and never used them, or possessed any other Edward Jones information, following his resignation, counsel was asked if Edward Jones was foregoing its request for preliminary injunctive relief based on Mr. Kerr's alleged retention and use of the documents, which served as the foundation for Edward Jones's breach of the confidentiality provision and misappropriation of trade secrets claims. Counsel conceded that the Court would

Additionally, despite initially stating that it was seeking preliminary injunctive relief for its claims of tortious interference with business relationships and unfair competition, Edward Jones has not developed a sufficient analysis of the preliminary injunction factors applicable to either of these claims.[5] Accordingly, we limit our review here to the alleged

---

be unable to make a finding in favor of Edward Jones without determining the credibility of Mr. Kerr, who was not present to testify at the hearing. Accordingly, we **deny** Edward Jones's request for preliminary injunctive relief per counsel's concession. Even if we were to analyze these claims on the merits, we could not find in favor of Edward Jones based on the evidence (or lack thereof) before us at this time. As to Mr. Kerr's alleged breach of the confidentiality provision, Edward Jones's only evidence is limited to Mr. Kerr's breach when he allegedly failed to return the documents upon his termination as required by the Agreement. However, it has failed to show how this action, absent evidence of retention or use of the reports, caused any damage to Edward Jones—an element of breach of contract under Missouri law. *Clayborne v. Enter. Leasing Co. of St. Louis, LLC*, 524 S.W.3d 101, 106 (Mo. Ct. App. 2017). Edward Jones likewise has not presented evidence to support its statutory trade secrets claims. Even if the client reports were trade secrets, Edward Jones has not shown any "actual or threatened" misappropriation under Indiana law because the evidence, as conceded by counsel for Edward Jones, does not indicate that Mr. Kerr took the client reports with any illicit intent, nor does it indicate his retention or use of the reports. *Compare Toyota Indus. Equip. Mfg., Inc. v. Land*, No. 1:14-CV-1049-JMS-TAB, 2014 WL 3670133, at *1 (S.D. Ind. July 21, 2014) *and Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507 (Ind. 1995) *with Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*, No. 3:12-CV-233 JD, 2012 WL 1877854, at *9 (N.D. Ind. May 22, 2012) *and Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 820 (S.D. Ind. 2007). Finally, with regard to its DTSA claim, Edward Jones has presented at most a minimalist argument, without citation to a single case, that the statute "predicate[s] liability" for Mr. Kerr's actions. Without evidence of Mr. Kerr's "disclosure or use" of the information in the client lists, however, Edward Jones also cannot show misappropriation under the DTSA. 18 U.S.C. § 1839(5) (2018).

[5] Edward Jones provided only a boilerplate statement of law regarding tortious interference with business relationships followed by one sentence stating that the facts meet the elements of claim. Even if Edward Jones's barebones argument could somehow provide support for a finding of a likelihood of success on the merits of this claim, Edward Jones has not identified any harm, let alone irreparable harm, for which there is no adequate remedy at law, resulting from this tort. Similarly, although Edward Jones stated at the outset of its brief that its unfair competition claim necessitated injunctive relief, it never addressed this cause of action in its briefing or at the court hearing. Without any factual or legal analysis whatsoever, we cannot grant preliminary injunctive relief for Edward Jones on its claim of unfair competition.

breach of the non-solicitation provision of the Agreement, which is the only claim that might possibly warrant the preliminary injunctive relief sought by Edward Jones.

Edward Jones alleges that in the days following Mr. Kerr's departure from Edward Jones and the commencement of his employment with Thurston, he began soliciting Edward Jones's clients [Compl., ¶ 4; Dkt. 5, at 4]. Specifically, Edward Jones contends that Mr. Kerr contacted his former clients to announce that he had transitioned to Thurston, he mailed an informational packet about Thurston to those clients, and requested at least one of those clients to transfer assets to Thurston [Dkt. 5, at 4-5]. Since his departure, approximately $8.7 million[6] of the $113 million of assets Mr. Kerr previously managed at Edward Jones have transferred to Thurston.

As evidentiary support, Edward Jones submitted affidavits from two Edward Jones employees: John Hermelbracht, Mr. Kerr's interim replacement; and Kennetta White, the employee at Edward Jones in Westfield with whom Mr. Kerr was at odds [Compl., Exh. B-C]. Mr. Hermelbracht asserts that "Edward Jones clients told me John Kerr asked at least one customer to transfer their [sic] assets from Edward Jones to Thurston" and that he "learned that multiple Edward Jones clients received a packet [sic] from John Kerr informing them about Thurston and the services it officers." [Compl., Exh. B ¶ 18-19]. Ms. White similarly declares that she "learned that Mr. Kerr asked at least one customer to transfer their [sic] assets from Edward Jones to Thurston" and that she "learned that

---

[6] Edward Jones asserted that $11 million of assets had transferred, while Mr. Kerr estimated this number to be $8.7 million. Counsel for Edward Jones conceded at the hearing that Mr. Kerr would have the most accurate assessment.

John Kerr mailed packets of information about Thurston and the services it offers to Edward Jones customers." [Compl., Exh. C ¶ 12, 14]. Neither affiant provided details as to the source of his/her knowledge, and counsel for Edward Jones could not enlighten the Court as to that information or any other evidence beyond that included in their affidavits.

Mr. Kerr admits that, after joining Thurston on August 2, 2019, he contacted his former Edward Jones clients to announce his transition to Thurston [Dkt. 22, at 7; Dkt. 22-1 ¶ 24]. He insists, however, that he did not solicit clients but merely informed them of his change in employment. [Dkt. 22, at 7, 10; Dkt. 22-1 ¶ 10, 25]. Mr. Kerr argues that his issuance of such an announcement was not only consistent with standard industry practice, but mirrored the strategy implemented by Edward Jones when it retains new financial advisors [Dkt. 22, at 7; Dkt. 22-1 ¶¶ 24, 25]. Counsel for Mr. Kerr speculated at the hearing that the majority of Edward Jones recruits utilizing a similar announcement procedure would likely be subject to non-solicitation contracts similar to Mr. Kerr's, as these are consistent with industry practice [*Id.*]. Counsel for Edward Jones did not dispute this factual contention.

Mr. Kerr denies using any of Edward Jones's information when issuing his announcement, adamantly maintaining in his affidavit that he discussed individual clients' abilities to continue utilizing him as their financial advisor only in response to their specific requests [Dkt. 22, at 10; Dkt. 22-1 ¶¶ 24-25, 35 41-42]. He also disputes providing any information to clients about Thurston, including supplying the informational packet, unless clients explicitly asked for more details on Thurston's

services. Mr. Kerr insists that he never asked any clients to transfer their assets to Thurston [*Id.*]. Mr. Kerr also challenges the ambiguous affidavits of Mr. Hermelbracht and Ms. White, which are based only on their second-hand knowledge, and thus provide insufficient evidentiary support for Edward Jones's accusations against him [Dkt. 22, at 11]. Mr. Kerr represents that his announcement was not aimed at soliciting clients so much as complying with his fiduciary duty as a Certified Financial Planner to inform clients of material changes to the management of their assets, which includes notifying them of his departure from Edward Jones [Dkt. 22, at 10.].

Mr. Kerr further notes that Edward Jones issued its own letter, dated August 2, 2019, to Mr. Kerr's former clients regarding his transition to Thurston [Dkt. 22, at 7, 9]. As a part of its letter, Edward Jones enclosed a FINRA notice informing Mr. Kerr's former clients that Mr. Kerr had left Edward Jones [Dkt. 22, at 7]. The notice specifically instructed clients to contact Mr. Kerr with any questions regarding his new firm and the impact of the transition on the client relationship [*Id.*]. Additionally, Mr. Kerr notes that Mr. Hermelbracht, his interim replacement, began calling clients to inform them of Mr. Kerr's transition on August 2, 2019, which prompted several clients to contact Mr. Kerr about the possibility of transitioning to Thurston before ever receiving Mr. Kerr's announcement [Dkt. 22, at 9; Compl. Exh. B ¶ 19].

In its Reply brief, Edward Jones does not address or otherwise respond to Mr. Kerr's sworn affidavit attesting to the fact that he provided clients with information about Thurston only upon their request, nor does Edward Jones respond to Mr. Kerr's declaration that he never asked any client to transfer assets. When questioned at the court

hearing, counsel for Edward Jones confirmed that there is no evidence at this time

supporting Edward Jones's allegations against Mr. Kerr, aside from the averments of Mr.

Hermelbracht and Ms. White, neither of whom was present at hearing to testify. Mr.

Kerr, on the other hand, provided affidavits from eight clients,[7] each of whom followed

him to Thurston and confirmed Mr. Kerr's claims that he did not "solicit, induce, or

encourage" clients in any manner to leave Edward Jones as well as his declaration that he

discussed Thurston only when the clients initiated the conversation and explicitly

requested more information [Dkt. 22, Exh. I-Exh. O]. Edward Jones has not identified

any contrary evidence.

Edward Jones's submissions also did not address Mr. Kerr's averments that

Edward Jones itself was supplying information to clients regarding Mr. Kerr's transition

during this time period. Counsel for Edward Jones confirmed during the court hearing

that Edward Jones did send the FINRA notice to clients of Mr. Kerr informing them of

his move to Thurston, and directing them to contact Mr. Kerr if they had any questions.

Though Edward Jones's attorney did not respond, either in his brief or at the hearing, to

the allegation that Mr. Hermelbracht was also calling Mr. Kerr's former clients around

---

[7] It is unclear from the briefing if these affiants represent the total pool of Edward Jones clients who transferred to Thurston. While counsel for Mr. Kerr implied that he provided affidavits for all who had followed Mr. Kerr, this does not appear to be accurate. Of the eight affiants, seven (87.5%) had personal relationships to Mr. Kerr. This contrasts with Mr. Kerr's statement that 70% of clients who followed him were close friends and family. Additionally, while seven of the affiants were personally connected to Mr. Kerr, none were family. Accordingly, we conclude that these affiants are not fully representative of all those who transferred. Despite these flaws, these affidavits comprise the only evidentiary materials made available to us relating to Mr. Kerr's alleged solicitation given that Edward Jones has not provided any evidence.

August 2, 2019 to provide this information, Mr. Hermelbracht's affidavit confirms this fact [Compl, Exh. B ¶ 15-16].

The timeline of when the various notifications were issued is inconclusive. It reveals that Edward Jones's FINRA notice and Mr. Kerr's announcement were likely issued concurrently; Mr. Kerr appears to have made his telephone announcements between August 2, 2019 and August 4, 2019, and Edward Jones's written notices were mailed out on August 2, 2019.  Five of the clients, whose affidavits were submitted as evidence and who followed Mr. Kerr to Thurston, confirm that they first received notice of the transition from Mr. Hermelbracht's August 2, 2019 phone call, not from Mr. Kerr [Compl. Exh. B ¶ 19; Dkt 22, Exh. K , Exh. L, Exh. M, Exh. O]. Four of these affiants also state that Mr. Hermelbracht's call prompted them to initiate contact with Mr. Kerr to discuss transferring their assets to Thurston [Dkt 22, Exh. K , Exh. L, Exh. M]. The other affiant states that shortly after receiving Edward Jones's notification, she received Mr. Kerr's call informing her that he had left Edward Jones. It was during Mr. Kerr's call that she, without prompting from Mr. Kerr, initiated the discussion of transferring her assets to Thurston [Dkt. 22, Exh. O]. The remaining three affiants first learned of the transition of Mr. Kerr from him, rather than Edward Jones. These affiants all had and continued to have personal connections to Mr. Kerr that pre-dated their business relationship with Edward Jones [Dkt. 22, Exh. I, Exh, J. Exh. N]. Likewise, they confirm that they requested, without any prompting from Mr. Kerr, more information on transferring their accounts to Thurston.

In sum, the evidence establishes that several transferee clients were first notified by Edward Jones's own communications, not Mr. Kerr's, which prompted them to seek out additional information relating to the transfer of their accounts. The evidence also shows that other transferee clients, who first learned of Mr. Kerr's transition from his announcement, had pre-existing, personal relationships with Mr. Kerr. Edward Jones does not dispute that the majority of these former clients (approximately 70%) who followed Mr. Kerr to Thurston were members of his family or close friends.

## Analysis

### I.      Standard of Review

A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). However, if these threshold conditions are met, the Court must then assess the balance of harms—the harm to Edward Jones, if the injunction is not issued, against the harm to Mr. Kerr if it is issued—and determine the impact of an

injunction on the public interest. *Id.* "The more likely it is that [the moving party] will win [its] case on the merits, the less the balance of harms need weigh in [its] favor." *Id.*

## II. Discussion

### A. Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on his claims are 'better than negligible.'" *Valencia v. City of Springfield, Illinois*, 83 F.3D 959, 966 (7th Cir. 2018) (*quoting Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)).

Under Missouri law, a party claiming breach of contract must show: (1) the existence of a valid contract; (2) the rights of plaintiff and obligations of defendant under the contract; (3) a breach by defendant; and (4) damages resulting from the breach. *Clayborne v. Enter. Leasing Co. of St. Louis, LLC*, 524 S.W.3d 101, 106 (Mo. Ct. App. 2017). Mr. Kerr does not contest the validity of the Agreement, which restricts him from directly or indirectly soliciting his former clients, nor does he dispute his obligation not to solicit Edward Jones's clients; however, he does dispute whether any actions by him constituted "indirect solicitations" and thus a breach of the Agreement.

"Solicitation" is not defined in the Agreement, but Missouri courts will find "indirect solicitation" where "the evidence shows that in making these contacts with customers defendant sought to maintain and establish further goodwill as a basis for future benefits." *McCann v. Barton*, No. 4:08-cv-00574, 2009 WL 90074, *20 (W.D. Mo. Apr. 1, 2009) (*quoting Adrian N. Baker & Co. v. DeMartino*, 733 S.W.2d 14, 16 (Mo. Ct.

App. 1987)) (*internal quotations omitted*). Although a proposed definition of "solicitation" has not been proffered by the parties, counsel for Edward Jones requested at the hearing that we adopt a broad interpretation of the term, specifically arguing that "indirect solicitation" means any initiated, targeted contact with Edward Jones's clients.

Edward Jones initially argued that several of Mr. Kerr's actions qualified as solicitation: first, when he issued his "announcement;" then, when he mailed informational packets about Thurston; and finally, when he asked one of Edward Jones's clients to transfer assets to Thurston. However, as counsel later confirmed at the hearing, Edward Jones lacks evidentiary support for many of these factual allegations against Mr. Kerr. Specifically, counsel for Edward Jones admitted that it had no evidence at this time, other than its affiants' declarations about what they had "learned," to contradict Mr. Kerr's assertion that he had sent Thurston information to clients only when prompted by the clients to do so. Counsel for Edward Jones also conceded that giving this information upon request was appropriate and did not constitute a prohibited solicitation. Counsel also confirmed that Edward Jones has no evidence at this time, outside of the affidavits from Mr. Hermelbracht and Ms. White, to contradict Mr. Kerr's declaration that he did not ask any client to transfer assets. Counsel was unable to provide any supplemental details to corroborate the general, second-hand assertions of the two affiants attesting to the fact that they had learned in some unspecified fashion that Mr. Kerr had issued such requests. Finally, counsel also conceded that Edward Jones has no evidence that Mr. Kerr has continued to contact clients after his initial phone calls in early August 2019.

Lacking sufficient evidentiary support that Mr. Kerr initiated the transmittal of Thurston information to Edward Jones clients (and conceding that sending the information upon clients' prompting did not breach the Agreement) or that Mr. Kerr requested any clients to transfer assets to Thurston, by the conclusion of the hearing counsel for Edward Jones abandoned these arguments, focusing instead solely on Mr. Kerr's announcement to his former clients following his resignation from Edward Jones in early August 2019. We accept counsel's concessions and limit our discussion to the single issue of whether Mr. Kerr's announcement constituted solicitation in violation of the Agreement. Missouri courts have not addressed whether an individual commits solicitation, directly or indirectly, when he contacts former clients to notify them that he has transitioned to a new employer. Thus, both Edward Jones and Mr. Kerr have relied upon case law of other jurisdictions to argue their respective theories.

Edward Jones cites *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz* in support of its assertion that a broker's announcement qualifies as an indirect solicitation.[8]

---

[8] Edward Jones cites a second holding in *Presto-X-Company v. Ewing*, 442 N.W. 2d 85 (Iowa 1989) to support its contention that a mere announcement qualifies as a solicitation. However, we find this case readily distinguishable as it involves a pest-control technician, not a financial advisor. As discussed hereafter, the financial broker/dealer industry involves trusted relationships between advisors and clients, requiring the court to consider public policy implications that the *Presto-X* court would not have had to entertain. Edward Jones cites six other cases in support of its general argument that Mr. Kerr solicited clients; however, upon careful review, only two of those cases support the proposition that an announcement alone, without any other communication, constitutes solicitation. *See Corp. Technologies, Inc. v. Harnett*, 731 F. 3d 6 (1st Cir. 2013); *Meyer-Chatfield v. Century Business Servicing, Inc.*, 732 F. Supp. 2d 514 (E.D. Penn. 2010); *Merrill Lynch, Pierce, Fenner & Smith v. McClafferty*, 287 F. Supp. 2d 1244 (D. Haw. 2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung*, No. CV 01-00659 CBM RCX, 2001 WL 283083 (C.D. Cal Feb. 2, 2001); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, No. 98 C 1435, 19998 WL 122780 (N.D. Ill. 1998); *State of Spannaus v. Centruy Camera, Inc.*

No. 01-0402, 2001 WL 1681973 (D.D.C Feb. 26, 2001). In *Schultz,* the defendant had

been employed as a financial consultant for Merrill Lynch, Pierce, Fenner & Smith, Inc.

("Merrill Lynch"). *Id.* at *1. Upon his resignation, the defendant did exactly what Mr.

Kerr did here—he called his former Merrill Lynch clients to advise them of his transition

to a new firm. Also, like Mr. Kerr, he did in reliance on his fiduciary duty to inform his

clients of the change. *Id.* at *2. The *Schultz* court rejected the defendant's argument that

this contact was not an indirect solicitation:

> Despite the "announcement" label the defendant places on it, such initiated,
> targeted contact is tantamount to solicitation because there is no reason to believe
> that a customer on the receiving end of such a phone call does not assume that the
> broker wishes for him to transfer his account. A genuine announcement, by
> contrast, has a broader, general nature, such as a newspaper or trade paper
> advertisement.

*Id.* at *3. Mr. Kerr cites two cases[9] as support for his argument that his

announcement did not constitute a solicitation.  In *Merrill Lynch, Pierce, Fenner & Smith*

*v. Brinkman*,[10] the court rejected Merrill Lynch's argument that the defendant was

---

309 N.2.2 d 735 (Minn. 1981). However, Edward Jones presented these cases prior to counsel's
concessions that Edward Jones had evidence only to support Mr. Kerr's "announcement."
[9] Mr. Kerr provides one other case supporting this assertion, but it relates to the insurance
industry. *Getman v. USI Holdings Corp.*, No. 05-3286-BLS2, 2005 WL 2183159 (Sept. 1, 2005).
[10] Edward Jones argues that *Brinkman* is not persuasive because the District of Arizona has
"rejected defendant's 'announcement' theory." [Dkt. 24, at 10] (*citing Compass Bank v. Hartley*,
430 F. Supp. 2d 973 (D. Ariz. 2006) (applying Arizona law)). We disagree. *Compass Bank* is
factually distinguishable from cases where courts have concluded that announcements were not
solicitations. Specifically, the *Compass Bank* court looked beyond the announcement to evidence
that showed that the defendant, while still employed with plaintiff, had delayed transferring
clients to a co-worker despite having agreed to do so, had prepared his announcements before
resigning from the plaintiff-employer, and had overnighted the announcements immediately
upon his resignation.  These facts, coupled with the contact information in the announcement,
caused the court to conclude that the defendant's intent behind his announcement was not merely
to inform. *Id.*  Moreover, the District Court for the District of Arizona affirmed in 2015 that, per

prohibited from advising clients that he was leaving the firm and moving elsewhere. No. Cv-08-1751-PHX-FJM, 2008 WL 4534299 (D. Ariz. Oct. 3, 2008). The Northern District of Illinois reached the same result, but more bluntly in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, when Merrill Lynch sought an injunction so broad the defendant would have not been permitted to inform his former clients of his transition. No. 00-C-2065, 194 F.R.D. 618 (N.D. Ill 2000). In contrast to the *Schultz* court, the *O'Connor* court stated that "[i]t would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit O'Connor from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact." *Id.* at 620. Of particular relevance here, the *O'Connor* court noted that it was even more disinclined to find that such an announcement was an improper solicitation, given that so many of the defendant's clients were his long-term friends whose personal relationships with defendant were what brought them to Merrill Lynch. *Id.*

The issue of when a communication becomes a solicitation is in a sense a "metaphysical" question, the answer to which turns out to be highly contextual. *See Corp. Tech., Inc. v. Harnett*, 731 F. 3d 6, 10 (1st Cir. 2013); *see also Fidelity Brokerage Services, LLC v. Callinan*, 1884CV02098BLS1, 2019 WL 1579097, at *7 (Sup. Ct. Mass. Feb. 11, 2019). Our own research reveals that the majority of courts who analyzing this

---

Arizona state law, "[m]erely, informing customers of one's former employer of a change of employment, without more, is not solicitation." *J.P. Morgan Securities LLC v. Krich*, No. CV-15-00979-PHX-DGC, 2015 WL 3604199, * 3 (D. Ariz. June 8, 2015).

issue within the context of the financial broker/dealer industry reject the theory that an "announcement," like Mr. Kerr's, qualifies as a solicitation, even where an employment agreement prohibits both indirect as well as direct solicitations.[11]

We join this majority in holding that Mr. Kerr's announcement does not qualify as a solicitation where there is no evidence to show that Mr. Kerr did anything but inform his former clients of his new employment. Nor is there evidence that he wrongfully appropriated Edward Jones's information to generate these notices.[12] Like the *O'Connor*

---

[11] *Bank of America Inv. Services, Inc. v. Byrd*, 2:09-CV-211, 2:09-CV-212, 2009 WL 10184606 (E.D. Va. June 15, 2009) (holding that brokers' telephone calls to former clients to inform them of their departure and provide new contact information was not an indirect solicitation); *UBsPaine Webber Inc. v. Dowd*, No. 015402BLS, 2001 WL 1772856 (Sup. Ct. Mass. July 7, 2004) (holding that a financial advisor's announcement to former clients stating that he had moved to Morgan Stanley and providing new contact information was not a solicitation). *See also Callinan*, 2019 WL 1579097, at *6 (stating that "this Court has explicitly recognized in numerous prior cases that a financial advisor may notify a client that he or she has left his or her former employer and will continue to provide advisory services through a new employer without such notice being deemed a 'solicitation,'" before holding that defendant's prolonged, strategic phone calls went beyond the purpose of merely providing notification); *J. P. Morgan Securities LLC v. Krich*, 2015 WL 3604199; *UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081 MJD/JSM, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013) ("[T]here is a difference between soliciting and contacting . . . The Court concludes that a neutral announcement of [Defendant's] new employer and contact information to the former clients with whom Defendant worked . . . is permissible and reasonable."); *But see*; *Nat'l City Corp. v. Boyd*, No. 1:08-CV-2189, 2008 WL 4346444 (N.D. Ohio Sept. 17, 2008) (holding that plaintiff had shown a likelihood of success on the merits where defendant had "mailed out announcement cards as a professional courtesy . . . and also telephoned some of these people . . ."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 497 (E.D. Pa. 2000) (concluding defendant's notice to clients that he had switched firms and they were "free to do what they wanted" was more than mere announcement).

[12] Courts are more likely to find such contact constitutes a solicitation when there is evidence that the defendants-employees improperly used confidential records or trade secrets obtained while at their former employers to issue the announcements. *See E*Trade Financial Corp. v. Pospisil*, No. 18-C-5908, 2018 WL 4205401 (N.D. Ill. Sept. 4, 2018); *Fidelity Brokerage Services LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671 (E.D. Tenn. Nov. 4, 2013); *Merrill Lynch, Pierce, Fenner & Smith v. McClafferty*, 287 F. Supp. 2d 1244, 1248 (D. Haw. 2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, No. 98 C 1435, 19998 WL 122780 (N.D. Ill. 1998). However, as previously discussed, there is no evidence here that Mr. Kerr

court, we credit the fact that many of the allegedly solicited individuals were Mr. Kerr's friends and family before they ever were Edward Jones's clients. Edward Jones's argument in favor of labeling Mr. Kerr's announcements to his former clients as impermissible solicitations is factually and legally unavailing.

Mr. Kerr's "undisputed assertion that [plaintiff's] standard operating procedure for recruitment and hiring instructs and encourages just the kind of behavior about which [plaintiff] is now complaining" is also persuasive. *H & R Block Fin. Advisors, Inc. v. Majkowski*, 410 F. Supp. 2d 1, 3 (D.D.C. 2006). Edward Jones has not disputed that its own protocols for bringing on duty its newly hired financial advisors includes instructing them to call their former clients to inform them of their new affiliation with Edward Jones and to provide their new contact information. In fact, its telephone script directs new hires to say to former clients:

> I just wanted to call you to let you know that I am no longer with (former firm). I didn't know if anyone told you. I have taken a position with Edward Jones as a Financial Advisor . . . I would like to give you a little additional information . . . . My new telephone number is _____. I would also like to give you my new office address.

The script also provides this caveat to the new employees:

> The purpose of this call is to announce your new association with Edward Jones. Therefore, do not stay on the telephone. **Do not solicit the client's business.** Stick to the script and get off the phone. **Your sole purpose is to announce your affiliation with Edward Jones.**

---

utilized the client reports or other confidential information belonging to Edward Jones to notify clients (many of whom he had pre-existing, personal relationships with) of his departure.

[Dkt. 22-1, Exh. C]. Despite its own protocol that distinguishes between an "announcement" of a new affiliation and a solicitation, Edward Jones seeks here to ignore this difference by labeling Mr. Kerr's identical announcement strategy as an improper, impermissible solicitation. Edward Jones fails to explain this apparent inconsistency. Edward Jones's insistence in characterizing Mr. Kerr's actions as inconsistent with standard industry practices seems more adversarial than rational. Mr. Kerr's description of his actions as "business as usual in the brokerage community" strikes us as true, particularly in light of Edward Jones's own practices and procedures. *Majkowski*, 410 F. Supp. 2d at 3.

Our holding here, we believe, is consistent with Missouri's rule that indirect solicitation turns on the defendant-employee's intent when contacting former clients. *Adrian N. Baker & Co. v. DeMartino*, 733 S.W.2d at 16; *Allstate-Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("[I]n determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). Here, the evidence substantiates Mr. Kerr's stated intent that his announcement satisfied his fiduciary duty to inform his former clients of material changes to their accounts, which includes a change of financial advisor. No evidence before us contradicts Mr. Kerr's stated purpose. That Mr. Kerr made no further contact with his former clients after this initial notification of his departure and that he never provided any information about Thurston unless his clients initiated such a discussion or explicitly requested more information all substantiate Mr. Kerr's claim.

We do not accept Edward Jones's argument that indirect solicitation includes any initiated, targeted contact with Edward Jones's clients, given that the majority of courts have reached a contrary result when faced with similar facts. Accordingly, Edward Jones's request for injunctive relief succumbs on the prong requiring a showing a likelihood of success on the merits of its claim.

## B. Irreparable Harm & Inadequate Remedy at Law

Of equal concern in terms of our analysis is Edward Jones's failure to establish that it has suffered or that it will suffer irreparable harm from Mr. Kerr's alleged "solicitation." Even if we were to adopt Edward Jones's definition of "solicitation" and conclude that Edward Jones had established a likelihood of success on the merits, injunctive relief would not be available to Edward Jones because it has completely failed to show that it would experience any harm, let alone irreparable harm, based on Mr. Kerr's announcement.

The evidence before us establishes that most of the Kerr clients Edward Jones allegedly lost to Thurston were clients who, after receiving notice from Edward Jones, sought out Mr. Kerr's services at Thurston, or were people who had a close personal connection to Mr. Kerr. We fail to see any compensable harm to Edward Jones from the loss of such business. *O'Connor*, 194 F.R.D. at 621 (concluding that plaintiff had not shown irreparable harm because it was "inconceivable" that defendant's close friends, who were never originally plaintiff's clients, would not follow him to his new employer). Also, given Edward Jones's contemporaneous notification to these clients about Mr.

Kerr's departure as well as its directions to them to inquire of Mr. Kerr if they had any questions, any claim of harm from Mr. Kerr's announcement is at best far-fetched. These glaring insufficiencies in Edward Jones's request for injunctive relief suggest that its intention in bringing this lawsuit was less about vindicating or recovering from or preventing its loss of client relationships resulting from Mr. Kerr's actions, and more to "teach him a lesson" for having left Edward Jones (after he was fired) and connected up with a competing firm. *See O'Connor*, 194. F.R.D. at 620.

To whatever extent Edward Jones has been harmed by Mr. Kerr's actions, any remedy would be at law because Edward Jones has raised no concerns regarding Mr. Kerr's continued contact with or solicitation of his former clients. Although the Seventh Circuit has recognized that a loss of customer relationships can constitute an irreparable harm for which there is no adequate remedy at law, there is no "*per se* rule" dictating that this type of loss always entitles the employer to preliminary injunctive relief. *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *10 (N.D. Ill. Oct. 25, 2018), *appeal dismissed*, No. 18-3479, 2019 WL 2208392 (7th Cir. Apr. 15, 2019) (*quoting Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) ("[T]he Seventh Circuit has specifically disclaimed a 'per se rule' that ongoing 'loss of consumer goodwill and relationships' based on past wrongful acts is irreparable.")).

When, as here, the loss of business can be attributed to an isolated event or events, rather than an ongoing phenomena that risks causing future harm, any "goodwill lost" can likely be compensated by monetary damages. *Id. See also Tradesman Intern., Inc. v. Black*, 724 F.3d 1004, 1013 (7th Circ. 2013) ("Preliminary injunctions are an ideal

remedy for plaintiffs whose damages are ongoing and difficult to pinpoint."). There is no evidence showing that Mr. Kerr initiated any contact with Edward Jones clients since his August announcement, and Edward Jones has not advanced any basis to claim that he will do so absent an injunction. The Court cannot enjoin a party from doing something he is evidently not doing. To the extent that Edward Jones has been harmed by Mr. Kerr's "solicitations," such harm flowed from the August announcement, and damages can be quantified accordingly.

### C. Balance of Harms

Having determined that Edward Jones has failed to satisfy the legal elements necessary to entitle it to a preliminary injunction, our discussion could end here. However, we delay to insert a comment on the public policy aspects of Edward Jones's requested relief.

What underlies the holdings in the relied-upon cases here is a judicial reluctance to restrict financial advisors' communications with their clients. Consumers are entitled to know when their trusted financial advisors will no longer be available to serve them. *See Christenson*, 2013 WL 2145703, at *6; *Byrd*, 2009 WL 10184606, at *9; *Dowd*, 2001 WL 1772856, at *1; *O'Connor*, 194 F.R.D. at 620. Courts have characterized the relationship between a financial advisor and her clients as "a personal relationship dependent on personal trust," vesting in the clients the right to be fully informed about the status of their accounts by the advisor with whom they are familiar and have an established relationship. *Byrd*, 2009 WL 10184606, at *9.

Such financial advisors can most assuredly be prohibited from "soliciting" clients when doing so contravenes their employment agreements, but they should not be foreclosed from issuing good-faith communications to clients notifying them that he or she has a left a firm. Such a restriction infringes on the rights of consumers more than it protects the plaintiff-employers. *See Christenson*, 2013 WL 2145703, at \*6; *Byrd*, 2009 WL 10184606, at \*9; *O'Connor*, 194 F.R.D. at 620. Accordingly, courts generally are very wary of issuing preliminary injunctions that restrict communications by financial advisors that merely inform clients of a material change in the management of their assets.

The balance of harms between the parties as well as the public interest also favor Mr. Kerr. Granting the requested injunction would unfairly and unjustifiably besmirch Mr. Kerr's professional reputation, while denying the injunction would not harm Edward Jones's interests, particularly since the conduct alleged by Edward Jones to have occurred in violation of the Agreement simply did not happen.

## Conclusion

For the reasons set forth above, we DENY Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. 4].

IT IS SO ORDERED.

Date: 11/14/2019

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

James E. Heavey
BARTON LLP
jheavey@bartonesq.com

Kathleen M. Howard
GREENSFELDER HEMKER & GALE, P.C.
khoward@greensfelder.com

Donald D. McBride, II
GREENSFELDER HEMKER & GALE P.C.
10 South Broadway, Suite 2000
St. Louis, MO 63102

Christopher A. Pickett
GREENSFELDER HEMKER & GALE, P.C.
cap@greensfelder.com

James Louis Policchio
SCHUCKIT & ASSOCIATES PC
jpolicchio@schuckitlaw.com

Colin C. Poling
SCHUCKIT & ASSOCIATES P.C.
cpoling@schuckitlaw.com

Brian P Sweeney
LAW OFFICE OF BRIAN P SWEENEY
bps@brianpsweeney.com